IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| WATERFLEET, LLC,<br>a Texas limited liability company,<br><br>    Plaintiff,<br><br>    v.<br><br>TANMAR RENTALS LLC,<br>a Louisiana limited liability company,<br><br>TANMAR COMPANIES LLC,<br>a Texas limited liability company, and<br><br>JOHN DOE,<br>a Texas resident,<br><br>    Defendants. | Civil Action No. \_\_\_\_\_<br><br>**JURY TRIAL DEMANDED** |

**VERIFIED COMPLAINT**

Plaintiff WaterFleet, LLC ("WaterFleet") seeks injunctive and monetary relief from Defendants TanMar Rentals, LLC and TanMar Companies LLC (collectively, "TanMar") and John Doe for trade secret misappropriation, against TanMar for trade dress infringement and unfair competition.

The Defendants have misappropriated trade secrets in violation of the federal Defend Trade Secrets Act, 18 U.S.C. § 1836(b), and the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code Ann. § 134A.001 et seq.; and Defendant TanMar has been and is committing trade dress infringement and engaging in unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(c) and Texas common law.

{00273616.1}

## I. PARTIES

1. Plaintiff WaterFleet, LLC. is a limited liability company organized under the laws of the State of Texas with its principal place of business located at 10110 Moursund Blvd, San Antonio, Texas 78221.

2. Upon information and belief, Defendant TanMar Rentals, LLC is a limited liability company organized under the laws of the State of Louisiana with principal places of business located at 302 Unatex Road, Eunice, Louisiana 70535 and 711 South Chestnut, Tomball, Texas 77375, and a place of business located at 40 Corgey Road, Pleasanton, Texas 78064.

3. Upon information and belief, Defendant TanMar Companies, LLC is a limited liability company organized under the laws of the State of Texas with its principal place of business located at 711 South Chestnut, Tomball, Texas 77375. TanMar Companies LLC owns TanMar Rentals, LLC.

4. Upon information and belief, Defendant John Doe is an individual resident of Texas living and working in this District.

## II. JURISDICTION AND VENUE

5. This Court has original subject matter jurisdiction over WaterFleet's claims pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b); the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*; and 28 U.S.C. §§ 1331 and 1338. This Court has supplemental jurisdiction over the Texas state law claims pursuant to 28 U.S.C. § 1367 because such claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

6. This Court has personal jurisdiction over TanMar because TanMar has established minimum contacts with this forum. TanMar regularly and continuously conducts business within this judicial district, by, among other things, marketing, advertising, offering to sell, and selling treatment services in this judicial district, including the services which are the subject of this Complaint. Additionally, this Court has personal jurisdiction over TanMar because TanMar has conducted tortious acts that have caused injury within this State and within this judicial district, and the claims alleged arise out of such tortious acts.

7. This Court has personal jurisdiction over John Doe because, on information and belief, he is a Texas resident living and working in this District, has conducted tortious acts that have caused injury within this State and within this District, and the claims alleged arise out of such tortious acts.

8. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c) because the claims alleged in the Complaint arose, in part, in this District, and because this Court has personal jurisdiction over Defendant in this District.

### III.  FACTS

*Plaintiff Develops Its Trade Secrets To Solve An Unmet Need*

9. In 2013, the Eagle Ford Shale field was booming. But at such drilling rig sites, as well as construction and emergency management sites, non-potable water was frequently the norm. Safety showers and on-site living quarters at drilling rig sites, for example, were connected to non-potable water where workers could not brush their teeth or take a pill with the water in the sink. And OSHA was issuing fines relating to non-potable water in safety showers.

10. Many hauled in water, but doing so is expensive and contributes to increasing truck traffic on temporary roads and their associated costs and hazards, and the water quality often suffered when it was not monitored and treated appropriately.

11. WaterFleet developed and implemented trade secrets that solved this problem. Based on decades of experience in water treatment, WaterFleet was established in January of 2014 by using proprietary technology and know-how to address this and related water treatment issues. Specifically, in 2014 WaterFleet, using this know-how and technology, developed and introduced the first self-contained mobile trailers ("Water Rigs") for converting up to 6,000 gallons per day of local water, from virtually any well and power source, to verifiable potable water and ice for land-based drilling sites by efficiently removing suspended, dissolved and organic contaminants; and by 2016 improved their self-contained Reclaimer Rig trailers using proprietary membrane technology and know-how to recycle domestic wastewater into higher quality discharge that allows for human contact and other uses, and may be returned to the environment or used on-site (hereinafter the "WaterFleet Trade Secrets").

12. The WaterFleet Trade Secrets have proven valuable. Applying the WaterFleet Trade Secrets, WaterFleet's Water Rigs have served a total of over a thousand drilling and completion sites, including at any given time more than 100 sites simultaneously. Plaintiff's fleet of Water Rigs has consistently been serving customer locations that represent over 20% of the Permian Basin rig count.

13. Application of the WaterFleet Trade Secrets has earned WaterFleet millions of dollars in revenue.

14. Third parties have recognized the value of the application of the WaterFleet Trade Secrets. WaterFleet, through its application of the WaterFleet Trade Secrets, has earned

approval by the Texas Commission on Environmental Quality ("TCEQ") of WaterFleet Water Rigs to act as a public water system—a first of its kind for a mobile water treatment system. In addition, WaterFleet has earned TCEQ approval for WaterFleet Reclaimer Rigs to discharge reclaimed water.

15. WaterFleet has implemented an effective system for controlling access to the WaterFleet Trade Secrets:

    a. The Water Rigs and Reclaimer Rigs that WaterFleet leases to customers are locked, so customers and third parties cannot enter them.

    b. WaterFleet's Water Rigs and Reclaimer Rigs also bear signage: "Authorized Personnel Only."

    c. All access into trailers that are being leased in the field are monitored by limit switches located on doors which trigger alarms at central WaterFleet operations control center. In addition, the control panel for the control system that operates the processes in its respective Water Rig and Reclaimer Rig trailers utilizes WaterFleet's proprietary control logic, and access is password-protected.

    d. Electrical schematics remain in the control cabinet inside the locked system.

    e. WaterFleet employees and independent contractors are required to sign a Confidentiality Agreement promising that all Confidential Information (as defined in the Agreement) will be kept confidential and will not, without prior written consent of WaterFleet, be disclosed in any manner whatsoever, in whole or in part. WaterFleet also maintains a professional and diligent culture that underscores the need for secrecy and the value of the WaterFleet Trade Secrets.

*Plaintiff's Distinctive Water Rig Trade Dress*

16. Before WaterFleet introduced its innovations, any branding of those who hauled in water was generally indistinct.

17. After WaterFleet developed its Trade Secrets, however, it adopted highly distinctive trade dress in 2014 for its Water Rigs (hereinafter the "Water Rig Trade Dress"):



18. WaterFleet has invested significant effort, time, and money in advertising and promoting its Water Rig Trade Dress in Texas and contiguous states.

19. Since its introduction, WaterFleet has used its Water Rig Trade Dress consistently and prominently on all of its Water Rigs and in its marketing, including on its website, other advertising, and provision of water conversion services in Texas and contiguous states.

20. By November of 2017, for example, WaterFleet was prominently deploying a fleet of Water Rigs featuring the Water Rig Trade Dress across more than 100 sites.

21. Through this prominent public appearance, the Water Rig Trade Dress has helped WaterFleet earn millions of dollars in revenue.

22. Through WaterFleet's consistent and substantial use of the Water Rig Trade Dress as a cornerstone of its brand identity, the Water Rig Trade Dress immediately became a distinctive and recognized symbol of WaterFleet for high quality water treatment.

23. Through its continuous use and promotion of the Water Rig Trade Dress, WaterFleet has developed and owns common law rights to the WaterFleet Trade Dress in connection with portable water conversion services in Texas and contiguous states.

24. As a direct result of WaterFleet's prior use and promotion of its Water Rig Trade Dress, the Water Rig Trade Dress has acquired secondary meaning and has become a valuable marketing and business asset of WaterFleet, which signifies to the market a standard of quality of products and services originating exclusively from WaterFleet.

### *TanMar's Unauthorized Use Of WaterFleet's Water Rig Trade Dress*

25. On information and belief, TanMar was primarily a surface rental services company, including rental housing and "truck and haul" water and wastewater logistics services for drilling sites.

26. Before WaterFleet established its Water Rig Trade Dress, TanMar's branding of its water hauling and other equipment—like that of others in the market--was indistinct (*e.g.*, in TanMar's case, tan in color).

27. Since WaterFleet's Water Rig Trade Dress obtained secondary meaning, TanMar began copying WaterFleet's distinctive Water Rig Trade Dress.

28.     Of the infinite variety of designs that TanMar could have chosen for its water conversion trailers (including its own traditional colors of tan, black and grey), TanMar adopted a copycat of WaterFleet's Water Rig Trade Dress:



29.     TanMar is using this imitation on all of its water conversion units, and is advertising and marketing its water conversion services on its website and elsewhere, by featuring photographs of its copycat trade dress.

30.     TanMar's adoption of this copycat trade dress was not a coincidence.

31.     Rather, TanMar used WaterFleet's Water Rig Trade Dress to create and adopt its highly similar design.

32.     TanMar adopted and has been using its copycat design in an effort to trade off WaterFleet's identity and reputation for high quality water conversion services.

33.     TanMar's imitation of the Water Rig Trade Dress has already caused actual confusion among customers, evidenced by, among other things, multiple calls placed to

WaterFleet by users of TanMar trailers regarding malfunctioning trailers that they mistook for WaterFleet Water Rigs.

### *TanMar's Misappropriation of the WaterFleet's Trade Secrets*

34. WaterFleet's Trade Secrets enabled WaterFleet to secure water conversion business from an increasing number of customers, including former customers of TanMar and dozens of sites previously served by TanMar's "truck and haul" logistics service.

35. In September of 2019, WaterFleet discovered that sometime around early March of 2019, Defendant John Doe left WaterFleet and applied for work at TanMar. During John Doe's job interview, John Doe offered to disclose confidential WaterFleet information to TanMar in an effort to get higher pay at TanMar.

36. John Doe's offer to disclose confidential WaterFleet information to TanMar was successful. Upon information and belief, one of the owners of TanMar asked John Doe to describe in detail how WaterFleet's Water Rig and Reclaimer Rig equipment works. Based on information and belief, John Doe provided the requested confidential information to TanMar.

37. TanMar obtained this confidential information—the WaterFleet Trade Secrets—including but not limited to WaterFleet's confidential process by which its Water Rigs convert local water to potable water, and the confidential process behind WaterFleet's Reclaimer Rig.

38. TanMar also obtained from John Doe a photograph of WaterFleet's confidential schematics that had been taken from inside WaterFleet's locked units, and other photographs of confidential content from the inside of WaterFleet's locked equipment.

39. After TanMar obtained these WaterFleet Trade Secrets from John Doe, TanMar gave John Doe a much higher pay rate than what it had previously offered to John Doe.

40. Upon information and belief, TanMar has plans, if it has not done so already, to expand to incorporate the WaterFleet Trade Secrets into TanMar's water conversion and reclaimer trailers.

41. Upon information and belief, TanMar has not invested the time, expertise or money in developing the water conversion business that WaterFleet has.

42. If TanMar is permitted to use WaterFleet's Trade Secrets, then TanMar would gain an unfair advantage and head start in any attempt to catch up with WaterFleet's water treatment business, and do immense harm to WaterFleet.

## IV. COUNT ONE
### (Misappropriation of Trade Secrets Under the Defend Trade Secrets Act 18 U.S.C. § 1836(b))

43. WaterFleet incorporates by reference each and every allegation contained in Paragraphs 1-42 of this Complaint as though fully set forth herein.

44. The above alleged facts constitute actual and threatened misappropriation of WaterFleet trade secrets by TanMar and John Doe under 18 U.S.C. §§ 1836 and 1839.

45. At all times relevant to this Complaint, WaterFleet owned the WaterFleet Trade Secrets as WaterFleet was the entity in which rightful legal or equitable title to the WaterFleet Trade Secrets is reposed.

46. The WaterFleet Trade Secrets include scientific, technical, operational, economic, and engineering information. The WaterFleet Trade Secrets include plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, and/or codes, which are tangible and/or intangible.

47. WaterFleet has taken reasonable measures to protect the secrecy of the WaterFleet Trade Secrets.

48. The WaterFleet Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

49. The WaterFleet Trade Secrets are related to and used in WaterFleet trailers and services sold or intended for use in interstate or foreign commerce.

50. WaterFleet derives significant economic benefits from owning the WaterFleet Trade Secrets.

51. TanMar and John Doe improperly acquired, appropriated, took, and upon information and belief disclosed, used, carried away, concealed, copied, duplicated, downloaded, replicated, transmitted, sent, uploaded, communicated, or conveyed the WaterFleet Trade Secrets for the benefit of TanMar. TanMar and John Doe performed such acts in furtherance of the trade secret misappropriation in at least this District.

52. TanMar and John Doe intended to convert the WaterFleet Trade Secrets to the economic benefit of one other than their owner WaterFleet.

53. TanMar and John Doe knew and intended that WaterFleet, as the owner of the WaterFleet Trade Secrets, would be injured by their actions.

54. As a result of TanMar's and John Doe's misappropriation of WaterFleet Trade Secrets, WaterFleet has suffered actual damages in an amount to be proven at trial.

55. As a result of TanMar's and John Doe's misappropriation, TanMar and John Doe have been unjustly enriched.

56. WaterFleet further pleads entitlement to a reasonable royalty to compensate WaterFleet for TanMar's and John Doe's misappropriation of trade secrets.

57. WaterFleet is informed and believes, and thereon alleges, that TanMar's and John Doe's misappropriation of WaterFleet's Trade Secrets was willful and malicious based on the facts alleged herein. TanMar and John Doe acted with a purpose and willingness to commit the acts alleged, and TanMar's and John Doe's conduct was not reasonable under the circumstances. WaterFleet is therefore entitled to exemplary damages and attorney fees and costs. WaterFleet further seeks exemplary damages against TanMar and John Doe in an amount up to two times the amount of WaterFleet's actual damages according to proof under U.S.C. § 1836.

58. The misappropriation of the WaterFleet Trade Secrets has caused and will continue to cause WaterFleet irreparable and substantial injury and therefore cannot be fully redressed through damages alone.

59. If TanMar and John Doe were permitted to continue to use the WaterFleet Trade Secrets, WaterFleet will be irreparably harmed and the economic damages to WaterFleet will be difficult to quantify. An injunction prohibiting TanMar and John Doe from further acquisition, disclosure, use, and possession of the WaterFleet Trade Secrets is necessary to provide WaterFleet with complete relief.

60. TanMar's and John Doe's wrongful conduct alleged herein by its misappropriation of WaterFleet's Trade Secrets will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to WaterFleet's business, and it could cause TanMar and John Doe to have improper advantages, positions, and rights in the marketplace to WaterFleet's detriment. Absent injunctive relief, TanMar's and John Doe's further use of WaterFleet's Trade Secrets would irreparably harm WaterFleet.

## V. COUNT TWO
### (Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code Ann. § 134A.001 et seq.)

61. WaterFleet incorporates by reference each and every allegation contained in Paragraphs 1-60 of this Complaint as though fully set forth herein.

62. The WaterFleet Trade Secrets are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

63. The WaterFleet Trade Secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

64. WaterFleet is the owner of the WaterFleet Trade Secrets.

65. Upon information and belief, TanMar and John Doe acquired the WaterFleet Trade Secrets of WaterFleet with knowledge or reason to know that the WaterFleet Trade Secrets were acquired by improper means.

66. Upon information and belief, TanMar and John Doe have used and disclosed the WaterFleet Trade Secrets of WaterFleet without express or implied consent and used improper means to acquire knowledge of the WaterFleet Trade Secrets.

67. Upon information and belief, TanMar, at the time of disclosure or use of the WaterFleet Trade Secrets, knew or had reason to know that its and its employee John Doe's knowledge of the WaterFleet Trade Secrets was derived from or through a person who used improper means to acquire it.

68. TanMar, at the time of disclosure or use, knew or had reason to know that its source John Doe's knowledge of the WaterFleet Trade Secrets was derived from or through its source, as a former WaterFleet employee, who owed a duty to WaterFleet to maintain the secrecy or limit the use of the WaterFleet Trade Secrets.

69. John Doe, at the time of his disclosure to TanMar, knew and had reason to know that his knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the WaterFleet Trade Secrets.

70. TanMar, at the time of disclosure or use of the WaterFleet Trade Secrets, knew and had reason to know that John Doe's knowledge of the WaterFleet Trade Secrets was derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy or limit the use of the trade secrets.

71. Alternatively, TanMar, before any material change of its position, knew or had reason to know that the disclosed WaterFleet Trade Secrets were trade secrets and that knowledge of the trade secrets had been acquired by accident or mistake.

72. The above alleged facts constitute actual and threatened misappropriation of WaterFleet trade secrets by TanMar and John Doe under the Texas Uniform Trade Secrets Act.

73. Unless enjoined by this Court, the acts of TanMar and John Doe complained of herein will cause WaterFleet to suffer irreparable harm for which there is no adequate remedy at law.

74. TanMar's and John Doe's misappropriation of the WaterFleet Trade Secrets has caused actual loss to WaterFleet and unjustly enriched TanMar and John Doe in an amount that is not presently ascertainable, but will be established at trial.

75. Upon information and belief, TanMar's and John Doe's misappropriation of the WaterFleet Trade Secrets has been willful and malicious.

### VII. COUNT THREE
### (Trademark Infringement and False Designation of Origin – Lanham Act. § 43(a), 15 U.S.C. § 1125(a))

76. WaterFleet incorporates by reference each and every allegation contained in Paragraphs 1-75 of this Complaint as though fully set forth herein.

77. WaterFleet's use of and secondary meaning in the Water Rig Trade Dress predates TanMar's use of its imitative trade dress.

78. TanMar's unauthorized use of the Water Rig Trade Dress is likely to cause confusion, mistake, or deception among consumers or potential consumers as to the source or origin of TanMar's products and services and the sponsorship or endorsement of those products and services by WaterFleet.

79. TanMar's unauthorized use of the Water Rig Trade Dress is likely to cause confusion, mistake, or deception among consumers or potential consumers as to the source or origin of WaterFleet's products and services and the sponsorship or endorsement of those products and services by TanMar.

80. The aforesaid acts of TanMar constitute trademark infringement, false designation of origin and false and misleading descriptions and representations in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

81. The acts of TanMar alleged in Paragraphs 1-80 above were committed willfully, with full knowledge of WaterFleet's rights, and with the intention of deceiving and misleading the public and causing harm to WaterFleet.

82. As a direct and proximate result of TanMar's infringing and unlawful acts, WaterFleet has suffered and will continue to suffer damages in an amount that is not presently ascertainable, but will be established at trial.

83. Unless enjoined by this Court, the acts of TanMar complained of herein will cause WaterFleet to suffer irreparable harm for which there is no adequate remedy at law.

## VIII. COUNT FOUR
### (Trademark Infringement – Texas Common Law)

84. WaterFleet incorporates by reference each and every allegation contained in Paragraphs 1-83 of this Complaint as though fully set forth herein.

85. WaterFleet's use of the Water Rig Trade Dress predates any alleged use by TanMar.

86. The aforesaid acts of TanMar constitute trademark infringement in violation of common law.

87. The acts of TanMar alleged in Paragraphs 1-86 above were committed willfully, with full knowledge of WaterFleet's rights, and with the intention of deceiving and misleading the public and causing harm to WaterFleet.

88. As a direct and proximate result of TanMar's infringing and unlawful acts, WaterFleet has suffered and will continue to suffer damages in an amount that is not presently ascertainable, but will be established at trial.

89. Unless enjoined by this Court, the acts of TanMar complained of herein will cause WaterFleet to suffer irreparable harm for which there is no adequate remedy at law.

## IX. COUNT FIVE
### (Unfair Competition – Texas Common Law)

90. WaterFleet incorporates by reference each and every allegation contained in Paragraphs 1-89 of this Complaint as though fully set forth herein.

91. The aforesaid acts of TanMar constitute unfair competition in violation of common law.

92. The acts of TanMar alleged in Paragraphs 1-91 above were committed willfully, with full knowledge of WaterFleet's rights, and with the intention of deceiving and misleading the public and causing harm to WaterFleet.

93. As a direct and proximate result of TanMar's infringing and unlawful acts, WaterFleet has suffered and will continue to suffer damages in an amount that is not presently ascertainable, but will be established at trial.

94. Unless enjoined by this Court, the acts of TanMar complained of herein will cause WaterFleet to suffer irreparable harm for which there is no adequate remedy at law.

## X. PRAYER FOR RELIEF

WHEREFORE, WaterFleet respectfully requests that the Court enter judgment against all defendants as follows:

a. Entry of an order that preliminarily enjoins, and a Final Order that permanently enjoins TanMar and John Doe, and their agents, servants, employees, and all persons acting in active concert or participation with them, from the unauthorized acquisition, disclosure, use, duplication, or distribution of the WaterFleet Trade Secrets, including but not limited to any water treatment processes that TanMar and John Doe have stolen from WaterFleet;

b. Seizure of TanMar trailers and any of John Doe's property incorporating any of WaterFleet's Trade Secrets;

c. Declaring that TanMar and John Doe have misappropriated the WaterFleet Trade Secrets;

d. Disgorgement of TanMar's profits as unjust enrichment as a result of its misappropriation of the WaterFleet Trade Secrets;

e. For actual damages in an amount to be proven at trial;

f. Royalties;

g. For award of expenses and costs incurred by WaterFleet as a result of the Defendants' wrongdoing alleged herein including all costs incurred to respond to, investigate and determine the scope, details and implications of Defendants' wrongful actions alleged herein, including the internal investigation costs, computer forensic costs and increased operational costs alleged above.

h. Entry of an order that all right, title and interest in patents improperly based on or derived from the WaterFleet Trade Secrets misappropriated by the Defendants be assigned or otherwise transferred to or declared owned by WaterFleet;

i. Exemplary damages equal to double WaterFleet's damages under Tex. Civ. Proc & Rem. Code Ann. §134A.004(b);

j. Preliminarily and permanently enjoining TanMar, its successors, officers, agents and employees, and anyone acting in active concert or participation with or at the behest or direction of any of them, from:

    i. using (including, but not limited to, in connection with the promotion, marketing, advertising, sale) the Water Rig Trade Dress, any colorable imitation thereof, including but not limited to the design shown in the figure at page 8 above, or any otherwise similar design;

    ii. doing any other act or thing likely to confuse, mislead or deceive others into believing that TanMar, or their products and services, are connected with, sponsored by or approved by WaterFleet; and

        iii.  engaging in any other activity constituting unfair competition with WaterFleet, or constituting an infringement of WaterFleet's rights in and to the Water Rig Trade Dress.

k. Declaring that TanMar has infringed WaterFleet's Water Rig Trade Dress;

l. Ordering that all signage, advertisements, labels, prints, packages, wrappers and receptacles in the possession of the TanMar bearing the Water Rig Trade Dress, or any colorable imitation thereof, be destroyed, and that magenta and any colorable imitations be removed from all Internet web sites, online advertising, marketing, promotions or other online materials, pursuant to 15 U.S.C. § 1118;

m. Ordering TanMar, pursuant to 15 U.S.C. § 1116(a), to file with the Court and serve on WaterFleet's counsel within 30 days after service of the injunction, a written report, sworn under oath, setting forth in detail the manner and form in which TanMar has complied with the injunction;

n. Ordering disgorgement of TanMar's profits from its use of water wagons infringing WaterFleet's Water Rig Trade Dress, under 15 U.S.C. § 1117 and Texas law;

o. WaterFleet's actual damages from trade dress infringement;

p. Awarding WaterFleet treble damages resulting from TanMar's willful and intentional conduct pursuant to 15 U.S.C. § 1117 and Texas law;

q. Reasonable attorneys' fees and costs;

r. Prejudgment and post judgement interest; and

s. Ordering or awarding any other such relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

WaterFleet hereby makes a demand pursuant to Federal Rule of Civil Procedure 38(b) for a trial by jury on all issues triable to a jury.

## VERIFICATION

I, Alan Pyle, verify that the facts alleged in this Complaint are true, except those items based on "information and belief," and those are believed to be true.

_____
Alan R. Pyle
President and Chief Executive Officer
WaterFleet LLC

Dated this 4th day of October, 2019.

Respectfully submitted,

_____
Ted D. Lee
Texas Bar No. 12137700
Gunn, Lee & Cave, P.C.
Callaghan Tower
8023 Vantage Drive, Suite 1500
San Antonio, TX 78230
(210) 886-9500 (phone)
(210) 886-9883 (fax)
tedlee@gunn-lee.com

Of Counsel:
John G. Froemming
Paul Sharer
Spencer Beall
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
(202) 879-3939 (phone)
(202) 626-1700 (fax)
jfroemming@jonesday.com
psharer@jonesday.com

*Attorneys for Plaintiff
WaterFleet LLC*